### NUNEZ v. UNITED STATES.

United States District Court, S. D. New York.

July 2, 1954.

Klein & Ruderman, New York City, for libellant.

J. Edward Lumbard, U. S. Atty., New York City (Kirlin, Campbell & Keating, New York City, Frank W. Stuhlman, New York City, of counsel), for respondent.

KNOX, Chief Judge.

In this suit against the United States, Francisco Nunez, who formerly was boatswain on board the steamship William Moultrie, seeks to recover damages for an accident that came to him on January 28, 1952.

Libellant was assigned to the duty of procuring a bed spring, which at the time, was stored in space that, during the last war, had been occupied by the vessel's gun crew.

Nunez ordered a seaman, Thomas Brennan, to assist him in the work. It appears that a number of empty fifty gallon steel drums were then stored in the gun crew's quarters. Each of them weighed about twenty or twenty-five pounds. In order to gain access to the bed spring it was necessary to remove or change the position of the drums.

In carrying out this operation, one of the containers was caused to drop on the top of libellant's left foot. As a result the instep of that foot was painfully bruised. Apparently, there was no laceration of the skin or flesh.

Following the accident, which occurred while the vessel was at sea, libellant was relieved of duty and his injured foot was treated with hot soaks in the ship's hospital. Several days thereafter the vessel reached London, and Nunez was sent ashore to the Tilbury and Riverside General Hospital in Essex. The foot was X-rayed but the film, so far as fractures of the bones were concerned, was negative. Libellant's injured foot was strapped and he was told to return to the hospital in three days for a further examination. This he did. He reported that his foot was more comfortable and no further treatment was supplied.

A few days later, libellant, on board his vessel, sailed for the United States. During the course of his voyage he did no work. When the ship reached Philadelphia, he signed off as a member of the crew.

In a deposition subsequently taken from Nunez he said that he was well treated on board the ship, and his attorney has stipulated that he has no claim against respondent for failure of the ship's company to give him treatment.

After reaching Philadelphia, libellant, in company with two of his shipmates, traveled to New York and became an outpatient at United States Public Health Hospital on Stapleton, Staten Island, and remained such from March 3, 1952, until May 14th of that year. An X-ray taken at Stapleton disclosed no bone fracture. A bandage was applied to the foot and it was subjected to physical therapy. On March 19th, 1952, a physician at the hospital observed no swelling of the foot, and his prognosis was that libellant would probably be fit for duty in two or three weeks.

On March 28, 1952, in the course of paying a visit to the hospital, Nunez, who was walking with the aid of crutches, slipped upon some snow or ice and twisted his foot. A cast was applied to the foot at the public health hospital and it was stated that libellant would not be fit for duty for another three or four weeks. On April 21, 1954, another X-ray of libellant's foot was taken. This film disclosed that he had suffered a fracture of the left supramalleolar fibula. After submitting to further physical therapy, libellant was declared to be fit for duty on May 14, 1952.

Libellant now claims that the empty oil drum was dropped upon his foot by Brennan. And that, due to this alleged negligence, the respondent should respond in damages.

The master of the William Moultrie at the time of the accident was Hardal Andreasen, now thirty-seven years of age, and, as a witness, made an excep-

tionally good impression upon me. Although born in the United States, his parents are Norwegians. At the age of seventeen, Andreason first went to sea and worked up through the various grades of the merchant marine service. Ten years later he was awarded the papers of a Master Mariner.

Called as a witness upon behalf of respondent, Andreason testified that, according to the vessel's log upon the day of the accident, the weather was partly cloudy, and the wind, at noon, was logged north, northwest, force 4, or at 15 to 20 knots per hour. At eight o'clock in the morning, near the hour of libellant's misfortune, there was a moderate northerly sea and swell. The vessel was rolling easily.

Under questioning, the Master was asked, if, under the above conditions, the ship would be absolutely stable. He answered, "No, it would not be stable. All ships roll a little bit at sea, because there is some movement of a vessel." Inquiry was made of him as to whether the sea had been "too rough a day to do any work on the ship". He replied, "According to what the log book says, it certainly would not have been too rough", and that it was not too rough to handle empty oil drums.

As respects libellant's accident, the master was asked if he knew of the injury suffered by Nunez and he answered, "Yes, I discussed (the accident) with him. I don't know exactly when it was, either the same day or the next day, or possibly the day after that. * * * He was down in his room and * * * I had been told that there was an accident—that the bo'sun had an injury to his foot and I was concerned with how it happened. So I went in and asked the man what happened. He said that he had dropped an empty barrel on his foot." Nunez denied that he told the Captain that he dropped the drum.

"He did not say that he was carrying the barrel or had the barrel in his arms. He just said to me that he dropped the barrel on his foot".

The log book entry of January 28, 1952, reads as follows:

"0830. Francisco Nunez, bo'sun worker in gunner's quarters aft, dropped empty garbage pail on left foot, bruise, swelling about instep. Knocked off work, treated with hot pads and soaked in warm water and epsom salts."

Libellant's version of the accident that came to him is this:—(Record, page 24, et seq.)

"Me and Brennan took the drums out of the way and take the spring outside, and Brennan he take them over out of the way.

* * * * * *

"Q. And after you put the spring out on the deck what did you then do? A. Put all the stuff back aft in that room again.

"Q. Now, at the time you were hurt, what was being put back into the room? A. Drums.

"Q. Who was handling or moving that drum? A. Brennan.

"Q. Did you have anything to do with or did you touch that drum in any way? A. No, I no touch that drum.

"Q. Will you tell the Judge how Mr. Brennan was holding that drum at the time you were hurt. A. Like that (demonstrating), and put it aside.

"Mr. Murphy: Indicating with one hand at the bottom and one hand on top.

"Q. And will you tell the Judge about how far the bottom of the drum was above the floor of the deck. A. About three or four feet, that high (indicating).

* * * * * *

"Q. And when Mr. Brennan dropped the drum, as you state, was there any motion to the ship? A. No, I sit down.

"Q. No, no. Was there any motion to the ship at the time Brennan dropped the drum? A. Oh, no, no motion of the ship.

"Q. Well, was the ship rolling?
A. No, nothing.

\* \* \* \* \* \*

"Q. I will ask you again, did you at any time touch this drum which fell on you? A. No, no, I no touch that drum.

\* \* \* \* \* \*

"Q. How did it happen that the drum came onto your foot? A. Well, the drum, he fall down. I am outside in the alleyway over there and Brennan he dropped the drum on my foot."

On January 23, 1953, Brennan made a written statement on behalf of Nunez, from which I quote:

"On the morning of Jan. 28, 1952, the Bo'sun Francisco Nunez and I were working in the after gun crew quarters. We were after a set of mattress springs for the saloon messman's bed. In order to get the springs it was necessary to remove the drums from the room and stack them in the passage way. It was necessary to hold the springs up so we could get the drums out. I don't remember how many were removed but it was 3 or more. We got the mattress springs out and on deck, and were returning the drums to the gun crew quarters. I grabbed the nearest drum and put it in the gun crew quarters. That left the remaining drums too high. *As I was replacing one of the drums that was on top of another the ship rolled, I lost my balance and the drum slipped out of my hands and fell striking the bosun on the left foot. I was carrying the drum by the chines.* (Italics mine). The drum was about waist high when it slipped from my grasp. I am 6'2" tall and thus the drum fell over 3 feet. The drum fell at a treacherous angle and the chine struck him on the foot.

"He cried out in pain in Spanish and he was in agony. He instantly sat down and began to hold his left foot crying and in Spanish. I ran to get the mate and he returned with me. The mate examined the bosun's foot and then the mate and I carried him to his foc'sle.

"I accompanied the Bos'n to the hospital in England. He made the voyage back to the States in his bunk and it seemed that most of the time he had a great deal of pain.
\* \* \* "

In Brennan's deposition, which was introduced upon the trial, he elaborated somewhat upon his written statement. In the course of his testimony, he said:

"Q. So that when you lift up the drum and turn to go into the room, during your turn you were facing the bulkhead against which the drums were stacked, is that right? A. That's right, the forward bulkhead.

"Q. And Nunez was about six feet from you near the door? A. Well, I couldn't see that because he was behind me. I mean he might have been next to me almost touching me or what have you, when I picked up the drum.

"Q. When the vessel rolled did you slip or stagger? A. I lost my balance.

"Q. Did you slip on anything? A. No, I lost my balance. I had the weight in a precarious position and as I was turning about all in the same sequence, and I was shifting my feet.

"Q. Did you take any steps from the time that you picked up the drum, between that time and the time it was dropped? A. Yes.

\* \* \* \* \* \*

"Q. When you turned around did you see him (Nunez) at all, to go toward the room? A. No, I wanted to get the drum in the room, I want to get rid of it, I have the weight, the ship is rolling, I want to get rid of the drum, I am not paying attention to Nunez. All I know is I have the drum and I want to get rid of

it and what I am doing is getting it into the door.

\* \* \* \* \* \*

"Q. What was the condition of the sea? A. For this time it was what you would call a little rough.

\* \* \* \* \* \*

"Q. Now, other than a roll which you say the vessel took, were there other rolls before and after—in other words, was the vessel rolling along before and after the accident? A. There is always a slight roll to any ship at sea when you have any swell running at all.

"Q. Was this an unusually heavy roll? A. Yes.

"Q. And there were no rolls like this before or after for, say a period of half an hour or an hour, either way? A. Well, this you might call a queer roll, a clear sea.

"Q. You mean an unusual one? A. Well, on a ship at sea you usually have a roll and a rhythm, and occasionally you take a queer sea that will break that rhythm and at times it will be a large sea, as a matter of fact, almost always it is a large sea to affect your rhythm that way, because you have a 10,000 ton ship—incidentally we had 9900 tons of coal aboard, that is what the mate told me anyway, when we sailed from Norfolk.

"Q. Now, what caused the drum to slip out of your hand? Was it the force of your body moving back and forth and staggering? A. The loss of my balance.

"Q. With the force of the drum suddenly moving? A. It could be a combination of things, but it was a loss of balance. No one will deliberately fall with a barrel, you wouldn't fall and let the barrel fall on you.

"Q. What could the combination of things have been, what do you mean by that? A. The combination of this unusual roll, the fact that I had the weight in motion, the fact that I haven't got enough room to shift my feet to brace myself or anything else, I am in a confined area, and like I say, it could be a combination of those things."

Upon the record now before me I am of the opinion that libellant's alleged cause of action should be dismissed. In my judgment he has not established by a fair preponderance of evidence that his injury is properly chargeable to any fault of the respondent. The master of the ship who, as I have said, made a most favorable impression upon me, testified positively that Nunez told him that he dropped the drum upon his foot. If this be true, respondent, on the facts of this case, is not liable.

But, even if this testimony be disregarded, which I shall not do, the testimony given by Brennan does not indicate fault upon the part of the ship. If, as a matter of fact, he dropped the drum on libellant's foot, it was a roll of the ship that caused him to drop the container. And, as anyone familiar with the sea well knows, a heavy roll, and even a "queer" roll is reasonably to be anticipated.

The evidence introduced by respondent, in an effort to impeach the credibility of the libellant, and with respect to his previous claims of negligence, will be stricken from the record. Libel dismissed.